MIAMI POWDER CO. v. PORT ROYAL & WESTERN CAROLINA
RAILWAY CO.

1. DAMAGES — CLAIM AND DELIVERY — CONSIGNEE — FREIGHTER —
COMMON CARRIER—FREIGHT—CASE CRITICISED.—The title to the
goods in the hands of a carrier is in the freighter or consignee, and it
follows that for damages to that property, by fault of the carrier, the
owner may sue the carrier for damages, when the damages equal or
exceed the freight, without first paying the freight charges; and when
the damages equal or exceed the freight, he may maintain an action
for claim and delivery of the goods without first paying the freight.
*Ewarts* v. *Kerr*, Rice, 203, *criticised.*

2. CLAIM AND DELIVERY—COMMON CARRIER—EVIDENCE—DAMAGES.
In an action against a common carrier for the possession of damaged
goods, any evidence as to the condition of the goods for some consid-
erable time after arrival is competent.

Before BENET, J., Greenville, November, 1895. Reversed.

Action by Miami Powder Company against Port Royal
and Western Carolina Railway Company, for damages to
400 kegs of powder, and for possession of same. The fol-
lowing are the remarks of Judge Benet in granting a non-
suit:

This is a motion for a nonsuit, upon the ground that there
is no evidence that the plaintiff had fulfilled the condition
precedent to the bringing of an action of this character—
namely, that the consignee should first pay the .freight
charges, before he can sue the common carrier for damages
done to goods *in transitu,* and on the additional ground
that there is no evidence that the powder was injured. This
second ground I must overrule. While the proof of injury
to the powder is meagre and unsatisfactory, still, such as it
is, it is a matter for the jury. Williams, the consignee, does
testify that of the 400 kegs of blasting powder in the con-
signment, a large portion—"from one-third to one-half"—
were badly damaged. And as to these damaged kegs, he
says: "I don't think I could have sold them for more than
half price." He describes the condition of the injured kegs

as being very badly indented, and as being wet, and adds that a sharp indentation breaks the japanning on the sheet iron kegs; that japanning is intended to prevent rust and dampness; that if dampness gets to the powder, the powder cakes and gets like dust. It is true, that he gives no positive testimony that the powder was actually injured, unless it be where he says that "strings of powder could be seen from the can to the platform." All the rest of his testimony could only amount to a presumption that the powder inside the indented kegs may have been injured. If the case were to go to the jury, I should particularly direct their attention to the nature of his testimany, but I should properly leave it to them to say whether or not it was sufficient to satisfy them that the powder was really injured. That the kegs were wet; that they were very badly indented; that sharp indentation breaks the japanning; that kegs are japanned to prevent rust and keep out dampness; that dampness causes blasting powder to cake and get like dust; that the japanning on many of the kegs was broken; that he could not have sold the indented cans for more than half price—all this, as proof of injury to the powder, may simply amount to a very far-fetched and shadowy presumption arising out of very little and unsubstantial proof of fact; but sufficiency of proof is a question solely for the jury. The case will not go to the jury, however. The motion for a nonsuit must be granted on the other ground—namely, that the consignee, the plaintiff's agent, did not pay the freight charges before bringing his action. The plaintiff's witness, Williams, testifies that the freight bill for the powder was $137, and that it was not paid; that the railway agent refused to let him have any of the powder unless he first paid the freight; that he offered to take the uninjured powder, and pay the freight, but that the railway agent said: "No; you must pay the freight on all before you can take it;" that as the freight was not paid, the consignment of powder was left in the depot; and that he does not know what became of the powder.

The case of *Ewart* v. *Kerr*, Rice, 203, and McMill, 141, is ·relied on by plaintiff's counsel in resisting the motion. The old Court of Appeals, in the year 1839, did lay down the doctrine in that case, that if the property of a freighter was damaged while in the care of the common carrier, to an amount greater than, or equal to, the freight charges, the common carrier's lien for freight was extinguished, and the freighter or consignee not only had the right to demand the property without payment of freight, but if delivery was refused, such retention amounted to a conversion, for which an action for trover would lie. This was the opinion of ·a divided Court, two of the five justices not concurring, and one of the two—Judge Earle—filing a very strong dis-·senting opinion. The case was heard over fifty years ago, in the early days of railroads. But even then the doctrine laid down was not in accord with the decisions of the Courts of England and the rest of the United States, nor has it since received support elsewhere. I have been shown no decision of any Court outside of this State holding similar doctrine. So far as I am aware, the invariable rule else-where is, that the freighter or consignee must first pay the freight charges, have the goods delivered to him, ascertain the damage he has suffered, and then bring his action. And that I must hold is now the rule in this State, since the decision of our present Supreme Court in the appeal taken in this case after the former trial (*The Miami Powder Co.* v. *Port Royal etc. R. R. Co.*, 38 S. C., 78). Mr. Justice Pope, speaking for the Court in that case, after recognizing the rule laid down in Ewart v. Kerr, says: "But we feel constrained to observe that the more recent decisions of the court of last resort in this State, notably the cases of *Shaw* v. *R. R. Co.*, 5 Rich., 462, and *Nettles* v. *R. R. Co.*, 7 *Id.*, 100, seem very clearly to point out the course of duty in a consignee, whose property is injured while in the control of the common carrier, to be to pay all freight charges and then sue the carrier for the injury done him."

What ·follows is peculiarly applicable to this case: "As a

practical result, we cannot see how the character and extent of injuries to goods can be correctly ascertained by the consignee while the same are in the hands of the common carrier, and hence this consignee is without the proof requisite to establish his claim for such damages." It was almost impossible for Williams, the consignee, in this case, to adduce any evidence of injury. His testimony consisted almost entirely of presumptions based upon presumptions, and not of facts proved. If he had had the powder kegs in his possession, he would have been able to prove what was the extent of the injury. Following the doctrine announced by Mr. Justice Pope, I am clearly of the opinion that the plaintiff in this case must suffer a nonsuit, because the consignee failed to pay the freight charges before bringing his suit. It seems to me, both as matter of law and as common sense, that before suing for damages, the plaintiff should have paid the freight, obtained possession of the goods, and ascertained the extent of the injury, if any. To hold otherwise would subject the common carrier to all the trouble and inconvenience so well depicted by the learned Associate Justice, and end by compelling the common carrier to become a retail merchant in self-defense. The motion is granted.

Mr. Parker, for plaintiff, asked the Court if he made any ruling that the damage did not exceed the freight charges—$137. The Court: "No, for Williams stated that he did not think he could have sold the damaged kegs for more than half price. If the whole lot was worth $860, then a third or a half would exceed the freight bill." Mr. Parker then asked if the ruling as to the nonsuit applied to both causes of action. The Court: "Yes, Mr. Parker, from the nature of both causes of action, my ruling necessarily applies to both."

In accordance with the Judge's rulings, a formal order of nonsuit was made.

From this order plaintiff appeals on following exceptions:

1. Because his Honor erred in excluding the testimony of James T. Williams as to the condition of a certain part

of the powder, and of the cans containing the same, when the same were exhibited in Court by Major Ganahl, one of the counsel for defendant at a former trial of this cause.

2. Because his Honor erred in excluding the testimony of James T. Williams as to the condition of the powder, and the cans containing it, when the same were delivered to him for disposition three years after the institution of this suit, by agreement of counsel.

3. Because his Honor erred in granting the nonsuit in this cause, so far as such nonsuit affects the first cause of action, it being submitted that there was some testimony, sufficient to be submitted to the jury, to the effect that the goods had been damaged to an extent equal to or greater than the amount of the freight, and that after demand the defendant had refused to deliver the goods to the consignee, who was entitled to the possession thereof.

4. Because his Honor erred in holding that it was a prerequisite to an action by the consignee against a common carrier for the conversion of goods, that the consignee had paid the freight due on such goods, even though it appeared that such goods had been damaged in transportation to an amount greater than the amount due for freight.

5. Because his Honor erred in not holding that, if goods are damaged in transportation by a common carrier to an amount equal to or greater than the freight due, it amounts to a conversion of said goods, for which the common carrier can be held liable, if it refuses to deliver the goods to the consignee, upon demand therefor.

6. Because his Honor erred in ordering a nonsuit as to the second cause of action, it being submitted that there was some testimony sufficient to submit to the jury to the effect that there was damage to the goods in transportation caused by the common carrier.

*Messrs. Haynsworth & Parker,* for appellant, cite: Rice, 203; 2 McM., 141; 8 A. & E. Ency., 977; 6 Whar., 435; 42 Vt., 431; Hutchison on Carriers, sec. 443; 56 N. Y., 198; 6 Rich., 462; 7 Rich., 190.

·*Messrs. M. F. Ansel* and *J. Ganahl*, contra, cite: *Evidence:* 3 Wood on R. R., 1939; 2 Rorer, 1273, sec. 3. *Res Adjudicata:* 38 S. C., 69; 42 Central L. Journal, 90; 117 U. S., 231. *Conversion:* Angell on Carriers, secs. 431–3; 2 Rem., 509; 5 Beur., 2825; 24 A. R., 610; 7 Rich., 192. *Payment of Freight:* 12 N. Y., 515; 5 Rich., 4–6; 7 Rich., 190; 38 S. C., 78.

July 23, 1896.   The opinion of the Court was delivered by

MR. JUSTICE JONES.   This action, commenced in 1889, was first tried in 1891 and resulted in a verdict for the plaintiff for $860.   On appeal, this verdict was set aside and a new trial ordered.   38 S. C., 78.   The case then came on to be heard before Judge Benet and a jury at November term, 1895.   The plaintiff was nonsuited, and this appeal is from the order of nonsuit.

The complaint alleges two causes of action.   The first cause is for damages, $860, the full value of 400 kegs of powder, which defendant, as a common carrier, contracted with plaintiff to deliver to a consignee at Greenville, S. C., but was so negligent therein, that said powder was wholly lost to plaintiff; also for $100 damages additional for delay and having to furnish other goods by reason of defendant's said negligence.   The second cause of action was for the delivery of 400 kegs of powder and for $430 damages for the negligent transportation thereof.   It is conceded that $137 is the amount of the freight charges for the transportation of the goods.   Judge Benet, in his remarks granting the nonsuit, concedes that there was some evidence tending to show that the amount of damages exceeded the amount due for freight.   The remarks of his Honor granting the nonsuit should be incorporated in the report of the case, together with appellant's exceptions.

The principal question in this case is whether a consignee or freighter must first pay the freight charges before he has any right to sue the common carrier for damages to the goods, or for the delivery of the goods and for

damages thereto, when the damages equal or exceed the freight. The order of nonsuit is based on the affirmative of this proposition. We think, upon reason and authority, that the nonsuit cannot be sustained. There is no doubt, that under our Code, sec. 171, in an action by the carrier for the freight, the freighter may set off or counter-claim any loss or damage he may have sustained to his goods by the negligence of the carrier in the transportation or delivery. Under the old English practice this was not allowed, but the freighter was compelled to resort to a cross-action. *Bornman* v. *Tooke*, 1 Camp. Rep., 377; *Sheilds* v. *Davis*, 6 Taun. Rep., 65. But this doctrine has been repudiated in America. It seems that in England now, under a comparatively recent statute, such a set-off is allowed in an action for the freight. It is stated in vol. 8, p. 977, of the A. & E. Enc. Law, that "in the United States it is well settled that if the goods are damaged in a manner for which the carrier is liable, the owner may deduct the amount of injury from the freight, or he may recoup the amount of damage when sued for the freight." In Redfield on Railways, vol. 2, p. 188, it is stated in the text: "If the goods be damaged in a manner for which the carrier is liable, the owner may deduct the amount of injury from the freight," and in a note on the same page it is said: "The right of the owner of the goods to insist on any damage done to the goods, for which the carrier is liable, by way of recoupment or deduction from the freight, is well established in this country, and is a most elementary principle, as applicable to analogous cases." Our case of *Ewart* v. *Kerr*, Rice, 203, was one of the pioneers on this line, and the Court's wisdom is being more and more vindicated. The freighter's right to set off his damages against the freight, is the first logical step in the solution of the question. Undoubtedly, the carrier has a lien on the goods for the freight due upon the performance of its contract. In *Ewart* v. *Kerr*, *supra*, Judge O'Neall said: "The lien of the carrier is made exactly equal to his remedy by action." Thirty years later the Ver-

mont Supreme Court, in *Dyer* v. *Railway Company*, 42 Vt., 441 (Am. Rep.; vol. 1, p. 350), said: "The carrier's lien is, of course, only coextensive with his right to claim and recover freight." In the last case above, the Supreme Court of Vermont said: "It is fundamental in the law, that the right of the carrier to have his freight results from the performance on his part of the contract, in virtue of which he undertakes and proceeds in the carriage of the property. If they fail to carry and have ready for delivery, they could not maintain a claim for freight. If in the carriage they should subject themselves to liability for damage to the consignee in respect to the property carried, that would disentitle, to the extent of such liability, to demand and recover freight. And if damage should exceed the amount of the freight to which they would otherwise be entitled, of course, they would not be entitled to demand and recover anything for the carriage of the property. Such seems to be the result of unquestioned principles and of the decided cases bearing upon the subject." This case distinctly holds, that where the carrier by delay in transporting and delivering goods has injured the consignee to an amount equal to the charge for freight, that the carrier's lien ceases, and the consignee may maintain replevin for the goods without paying or tendering the freight. In Am. & Eng. Enc. Law, vol. 8, p. 969, it is laid down that the carrier's lien is coextensive with its right to recover freight; and, same volume, p. 977, if the damage equal the freight, the carrier's lien is gone—citing our case of *Ewart* v. *Kerr*, *supra*, and the Vermont case *supra*, and other cases. *Ewart* v. *Kerr*, though decided in 1839 by a divided Court, was again before the Court in 1840, and the doctrine announced in the former decision was reaffirmed, 2 McM., 143. This case expressly rules that the carrier's lien for freight is only coextensive with his legal right of action for freight, and may be defeated where the damage done to the goods, by the fault of the carrier, equals or exceeds the freight, that in such case the freighter may maintain trover against the carrier for the goods detained under

the supposed lien for freight. This case has never been expressly overruled, but it is argued that this Court, in *Miami Powder Co.* v. *Port Royal and Western Carolina Railway Co.*, 38 S. C., 78, announced principles in conflict with it; Mr. Justice Pope, delivering the opinion in this case, said, after stating plaintiff's contention: "This Court is relieved of an extended consideration of these propositions of law, because this precise point was considered by the Court of Appeals years ago, in the case of *Ewart* v. *Kerr*, Rice, 203, 2 McMull., 141, and in that case it was decided by a divided Court, that if the property of plaintiff was damaged, while in the care of the common carrier, to a greater extent than the bill of freight, the lien of the latter was extinguished, and the consignee not only had the right to demand the property of the carrier without payment of freight charges, but that such retention by the common carrier after the demand made, amounted to a conversion, and that an action of trover would lie. It must be observed, that in order for the principle established in *Ewart* v. *Kerr*, *supra*, to apply, the damage to the property, while in the hands of the common carrier, must be equal to or greater than the freight charges. There is no evidence establishing this fact in the case at bar, and the charge of the Circuit Judge, in response to the request to charge of the defendant, appellant, failed to place this essential element before the jury." It is obvious from the above quotation that the Court did not only *not* overrule, but distinctly reaffirmed the doctrine of Ewart *v.* Kerr. It is true, and without attempting to explain by hair-splitting distinctions, we frankly confess that there follow the above quotation expressions that may mislead as to the opinion of the Court concerning Ewart *v.* Kerr as authority. These expressions, quoted as tending to impeach the doctrine established in Ewart *v.* Kerr, must be taken, and were meant to be taken, as words of caution merely, in view of the practical difficulties in the way of establishing the facts necessary to be established in the application of that doctrine. As a general rule, it *is* wisest and safest for

the freighter to pay the freight and then sue for damages, since the possession of the goods by the consignee would earliest put the goods to their designed use, would tend to diminish the injury arising from the detention for that use, and especially would afford the consignee better means of ascertaining the amount of damage already done; but this is a rule of caution and not a rule of law.   The case of *Shaw & Austin* v. *S. C. R. R. Co.*, 5 Rich., 462, decides what is the rule of measurement of damages in a case where the goods in the carrier's possession are not injured in quality, but deficient simply in quantity.   In this case ten barrels of molasses were shipped to the consignee in Camden, who received eight of the barrels, and declined to receive the other two, because some thirty gallons, worth $8.40, had leaked out.   The Court decided under these circumstances that the owner could not abandon the two barrels, and recover their entire value; that he could only recover the price at the place of delivery of the goods actually lost. The value of the goods actually lost being only $8.40, the case was dismissed for want of jurisdiction, not because the owner refused to receive the goods on tender by the carrier. We have no doubt that if the damages proven had been an amount within the jurisdiction of the Court, recovery would have been allowed for that amount.   In the case of *Nettles* v. *Railroad Co.*, 7 Rich., 190, there is nothing inconsistent with the doctrine of Ewart *v.* Kerr.   This case was a suit for $120 damages for non-delivery, within a reasonable time, of two cases of wool hats, the original cost of which was $90, upon which plaintiff proved he could have realized a profit of $30.   The goods ought to have been delivered in May, whereas they were tendered in September.   The jury were told by Judge O'Neall that the plaintiff ought to have received them on tender in September, and claimed damages which he had sustained for their non-delivery in time.   The jury found a verdict for $100.   The Appeal Court said: "When they (the goods) were tendered to him, he should have accepted them, and thereby the extreme measure of

damages would have been reduced by deduction therefrom of the value of the goods according to their condition at the time and place of tender;" and further said: "it would have been more satisfactory, if by accepting the goods the plaintiff had been enabled to show exactly the deterioration they had sustained." But it is not intimated in either of the cases last mentioned that payment of the freight and receipt of the goods is essential to maintain an action by the owner for damages thereto by fault of the carrier. On the contrary, so far as the Nettles case shows, no freight was tendered by him for the goods, and he refused the goods when tendered apparently without demand for freight, yet the verdict was sustained. If it had been a rule of law for the freighter to first pay the freight and receive the goods before suing for damages, it is impossible that the verdict in this case could have been sustained. The title to the goods in the hands of the carrier is in the freighter or consignee, and it follows that for damage to that property by fault of the carrier, the owner may sue the carrier for damages, even though the property be held by the carrier for the payment of freight thereon, when the damages equal or exceed the freight, in which case the freight charges may go to cancel or diminish the damages. When the damage equals or exceeds the freight, the carrier's lien for freight is gone, and the owner's right of possession of his property is complete, and he may maintain an action of claim and delivery for the property and for damage. The carrier thus loses no right; he either holds the goods under his claim for freight or he is protected by the bond given by the plaintiff for the return of the property, in the event he fails in his action; while, on the other hand, nothing would protect the freighter against his loss in the event of insolvency of the carrier, if the freighter were compelled first to pay freight before suing for damages. It follows, from these conclusions, that the Circuit Court erred in granting the nonsuit on either or both causes of action.

We think, also, there was error in refusing to allow evi-

dence as to the condition of the powder, some considerable length of time after its arrival in Greenville. The evidence was competent for whatever it was worth, on the question of damages sustained at the time the powder was tendered by the carrier upon condition of payment of freight. Whether the jury could infer what was the condition of the powder at that time, by its condition at a later time, would depend upon the facts and circumstances of the case. The sufficiency of the evidence was wholly for the jury. It is clear that it would be competent for the defendant to exhibit to the jury the powder at any time of trial for the purpose of showing that it was not damaged then, from which the jury could infer that necessarily it was not damaged at the time of tender. For a like reason, the plaintiffs may show the condition of the powder at any time before trial, as a means, however weak may be the force of the evidence, of showing its condition at the time of tender. Besides, if there is evidence tending to show that the powder was damaged at the time of tender, to an amount equal to or exceeding the freight, then it becomes relevant, in an action for claim and delivery and for damages, to show the condition of the powder at any time before judgment; because, if the damage at the time of tender exceeded the freight, the detention of the goods by the carrier was unlawful, and damage resulting from that unlawful detention becomes relevant.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and that the cause be remanded to the Circuit Court for a new trial.